STUBBINGS, Respondent, vs. O'CONNOR and others, Appellants.

*February 2 — March 14, 1899.*

(1) *Partnership: Dissolution by death of active partner: Continuance of business by administrators: Liability of dormant partner for losses.* (2) *Interest.*

1. The partnership relation existing between a dormant partner and the ostensible proprietor of a business, under an agreement treating the property as belonging to the latter and providing that he should repay the amount which the former had invested in the business, with interest and a share of the net profits, was dissolved by the death of the active partner, in whose possession all the partnership assets then were; and the business was thereafter carried on by his administrators in the name of the estate, with the knowledge and consent of the former dormant partner, who did not take possession or control as survivor or constitute said administrators his agents to continue the business. Afterwards said dormant partner brought suit to foreclose a mortgage which had been given to him by the active partner to secure the repayment of the amount invested by the dormant partner in the business. *Held,* that in such action the dormant partner was not chargeable with any part of the losses incurred in the business after the dissolution.

2: Where, pursuant to an option given him, the holder of a note has, before its maturity, declared the whole amount thereof to be due and payable, interest coupons subsequently maturing will not bear interest, in the absence of a clearly expressed written agreement to that effect.

APPEAL from a judgment of the circuit court for Oneida county: CHAS. M. WEBB, Judge. *Affirmed in part; reversed in part.*

For the appellants there was a brief by *Ryan, Hurley &. Jones,* and oral argument by *T. C. Ryan.*

*John Barnes,* for the respondent.

CASSODAY, C. J. This is an action to foreclose a note and mortgage upon real estate given by John O'Connor, now deceased, and the defendant, *Ann O'Connor,* his wife, to the plaintiff, April 10, 1889. The following facts appear in the record, and are undisputed or found by the court:

Prior to August 8, 1888, the plaintiff (who then, and has ever since, resided at Chicago) owned a stock of goods at Marinesco, Michigan. John O'Connor entered into an agreement in writing, wherein and whereby the plaintiff agreed, in effect, to furnish to John O'Connor such sums of money as might be agreed upon between them, for the purpose of opening a general store at Eagle River, and he was to receive for the same interest thereon at ten per cent. per annum for the time such moneys were in the business, payable semi-annually. John O'Connor was to give security for all moneys so advanced. Interest was to be paid out of the business, and also the expenses of running the store, after which the profits were to be equally divided between the plaintiff and John O'Connor on the first day of January and July of each year. Thereupon the plaintiff's stock of goods at Marinesco was taken to Eagle River, where John O'Connor resided, and put into such general store at that place, in the name of John O'Connor, but, it would seem, without any agreement as to

the amount that the plaintiff should be allowed for such stock, except that the same should be put in at cost price; and so it happened that a controversy arose between the plaintiff and John O'Connor in respect to the amount to be allowed for such goods. During the winter of 1888–89 the plaintiff was engaged in logging operations in the vicinity of Eagle River, and his jobbers purchased at the store in Eagle River goods to an amount exceeding $5,000, the payment of which was guaranteed by the plaintiff. The plaintiff asserted that the prices charged him on account of the goods were unreasonably high, which John O'Connor denied; and the latter claimed that the price claimed by the plaintiff for the Marinesco stock was more than should be paid therefor. The matters in dispute were finally adjusted and settled by the parties thereto, without any fraud, concealment, or mistake having been practiced by or upon either of the parties; and it was further mutually agreed that the plaintiff should pay in full the accounts at the store which he had guaranteed, and that he should throw off $100 from the price claimed for the Marinesco stock, and that he should receive credit for such stock to the amount of $4,235.60 on account of the same, and which sum was the agreed value of the stock.

The parties had a full and fair settlement of their partnership transactions and dealings April 10, 1889, and it was found and agreed by them on that date that the plaintiff had made advances to John O'Connor for the purpose of carrying on the business, which, with interest thereon, together with the agreed value of the Marinesco stock and interest thereon, amounted in the aggregate to $19,576.43; that the accounts at the store so guaranteed by the plaintiff amounted in the aggregate to $5,085.63; and hence that the net balance invested by the plaintiff in the business amounted to $14,490.80. Upon such settlement the plaintiff and John O'Connor entered into an agreement in writ-

ing, dated April 10, 1889, and signed by them, respectively, wherein it was recited that John O'Connor was then, and for some time prior thereto had been, engaged in carrying on a general merchandise business in Eagle River, and that the plaintiff had theretofore loaned to him $14,611.50, which he therein agreed to allow to remain with John O'Connor for a period of five years from May 1, 1889; that therefore, and in consideration of the above, John O'Connor covenanted and agreed with the plaintiff to pay to him interest at ten per cent. per annum on $14,611.50, evidenced by a note of even date, and also one half of the net profits aris-. ing from the business conducted by John O'Connor,— the net profits to include all the proceeds arising from the business, after deducting all current expenses, including rent of store and clerk hire; that John O'Connor thereby agreed to keep a true and correct set of books, showing all the accounts and transactions of the business, which books should be open at all times for the inspection of the plaintiff; that such agreement should bind the parties thereto, their heirs and assigns; that during the term of five years the stock of goods in such business should not be sold out in bulk without the consent of both parties thereto.

On the same day, and as a part of the same transaction, John and *Ann O'Connor*, his wife, executed and delivered to the plaintiff their promissory note in writing, payable five years after date, for $14,611.56, with interest at ten per cent. per annum, and at the same time gave him five coupon notes, each for the amount of such annual interest, and due in one, two, three, four, and five years, respectively, for the purpose of securing the payment of the annual instalments of interest on the principal note as the same might become due.   As collateral security for the payment of such six several notes, John O'Connor and wife made and executed the mortgage in question upon the real estate described.   It was further stipulated and provided in and by

the notes and mortgage that in case default was made in the payment of such notes, or of any interest due thereon, or any part thereof, at the times specified therein, the whole amount of principal and interest thereon would become due and payable immediately, at the option of the plaintiff. The mortgage was duly recorded April 11, 1889. It was the purpose and intention of the parties that John O'Connor should assume all the partnership debts April 10, 1889, and become liable to the plaintiff for the entire amount of moneys furnished by him for the purpose of carrying on the business. The plaintiff did not furnish any money or means to carry on the business after April 10, 1889.

John O'Connor died July 4, 1889. Immediately after his death his widow and children opened the store and commenced to sell goods and carry on the trade in the usual manner. The care and conduct of the business were under the immediate supervision of nis son *George E. O'Connor,* with the apparent knowledge and consent of the other heirs. Goods were bought for the continuance of the business, immediately after the death of John O'Connor, by *George,* in the name of the estate, and several of the heirs were employed in carrying on the business. The defendants *George* and *Ann O'Connor* applied for letters of administration of the estate, and were duly appointed as such administrators in September, 1889, and inventoried the stock and accounts due on account of the business as part of the estate; and thereafter the business was, with the knowledge and consent of the other heirs, carried on in the name of *George,* as administrator of the estate, by *George* and *Ann O'Connor.* George continued to sell the stock on hand at the death of his father, and to replenish it with other stock, and to use moneys received from real estate and rents, as administrator, for the purposes of carrying on the business, until September, 1891, when the business became hopelessly insolvent.

The plaintiff did not visit Eagle River, nor have any cor-

respondence relative to the business with the heirs, until July 31, 1889. He did not then or thereafter assert any claim to the property as surviving partner, and did not undertake to assume any control over the property. The plaintiff took no part in the management of the business, and exercised no control over the same, and made no advances for the purpose of carrying it on, after the death of John O'Connor. In the latter part of July, 1889, the plaintiff expressed to a son-in-law of John O'Connor, as his opinion, that it would be best for all concerned to continue the store business, and July 31, 1889, he had a conversation with *George* to the same effect, and thereafter the store business was so conducted and carried on with his knowledge and approval.

On July 17, 1890, the administrators paid on the notes and mortgage $1,000, to be credited upon interest due and payable at that date. On July 15, 1891, the plaintiff duly exercised his option to declare the whole sum secured by the notes and mortgage due and payable, and did declare the same due and payable, and duly served notice of such option upon the defendants herein.

This action was commenced August 28, 1891, against the administrators alone. On or about November 18, 1891, the summons and complaint were amended by adding the heirs at law of John O'Connor. On the same day the amended complaint and notice of *lis pendens* were, respectively, filed. On or about November 12, 1891, the administrators answered as such. After the summons and complaint were so amended, they answered the same as heirs at law. They answered, by way of counterclaims, some of the facts stated, including the agreements of August 8, 1888, and April 10, 1889, mentioned, and, among other things, that between August 8, 1888, and April 10, 1889, the plaintiff had put into the business $13,650.43, besides the Marinesco stock, and had drawn out, in goods, wares, and merchandise, at

cost prices, $5,085.83; that the Marinesco stock was put in at $4,145.60, whereas it was only of the value of $1,000; that April 10, 1889, it was agreed between John O'Connor and the plaintiff that the former should assume the entire debts of the firm to the plaintiff, and give his note and mortgage therefor, as stated; that the plaintiff claimed and falsely represented to John O'Connor the amount due to him from the firm, and the same were relied upon by him, and in that way the plaintiff procured the note and mortgage; that the plaintiff claimed for moneys advanced $1,084.54 too much; that he failed to deduct the $5,085.83 mentioned; that during the time the firm was engaged in business, its net losses amounted to $5,100, consisting in part in bad accounts, and the remainder in overcharges on the Marinesco stock, and other overcharges; that upon the death of John O'Connor, July 4, 1889, the plaintiff, as matter of law, became possessed of all the stock of goods, book accounts, moneys, and fixtures of the firm, as surviving partner thereof; that the firm assets at that time were $17,162.75, and the firm debts $3,352.53, and that the plaintiff, as such surviving partner, was bound to account for the balance of $13,810.22. The answer further alleged that *George* remained in the store as a mere clerk and agent of the plaintiff; that the plaintiff was also accountable for rent of the buildings at the rate of $60 per month. And the answer prayed that such several counterclaims and offsets be allowed against the plaintiff's note and mortgage.

The plaintiff replied to such counterclaims, and put the same in issue.

On the trial of such issues the court found, in addition to the facts stated, that through some error or oversight there was included in the notes and mortgage of April 10, 1889, $84.54 in excess of the amount actually found due from John O'Connor to the plaintiff in such settlement, and that that sum should be credited on the notes and mortgage as of

April 10, 1889; that the Marinesco stock was a second-hand stock, and was not adapted to the trade in Eagle River, and not worth to exceed $1,800; that the loss to the firm on such deal amounted to $2,435.60, and that the plaintiff was equitably chargeable with one half of such loss, amounting to $1,217.85, and that amount should be deducted from the note and mortgage as of April 10, 1889; that between April 10, 1889, and July 4, 1889, the plaintiff purchased goods out of the store to the amount and value of $688.85, and that sum, with interest thereon from July 4, 1889, was a valid counterclaim against the plaintiff; that neither *George* nor *Ann O' Connor* carried on the business, after the death of John O'Connor, as the agent of the plaintiff, and that the plaintiff did not carry on the business, either personally or through the instrumentality of agents, after such death; that the defendants have failed to prove or establish the allegations of any of the counterclaims set up in any of the answers interposed, except as so found; that the plaintiff was entitled to recover $100 solicitor's fees, as provided in the note, in addition to the taxable costs, which sum was found to be a reasonable amount.

And as conclusions of law the court found, in effect, that there should be deducted from the note and mortgage, as of April 10, 1889, the $84.54 mentioned, also the $1,217.80 mentioned, also $688.85 with interest thereon at six per cent. from July 4, 1889,— making in all $962.77; also, $1,000 paid July 17, 1890, to be credited as of that date; that, except as found, none of the counterclaims or defenses set up in the answers herein have been established for the purpose of defense, setoff, or counterclaim; that there was due and owing to the plaintiff on the notes and mortgage the principal sum of $13,309.22, with interest thereon from April 10, 1889, to February 20, 1896, at ten per cent., making for principal and interest $22,429.73; that there was due the plaintiff, for interest on the coupon notes given to secure

payment of interest the following amounts: On the note maturing April 10, 1890, $116.29; on the note maturing April 10, 1891, $387.50; on the note maturing April 10, 1892, $307.65; on the note maturing April 10, 1893, $227.80; on the note maturing April 10, 1894, $147.95,— making in all for interest on coupon notes $1,187.19, which, with the principal and interest, amounts to $23,616.92; that there was to be deducted from that amount the sum of $1,000 paid July 17, 1890, and $962.77 due from the plaintiff on the account to the defendants, leaving the net balance due to the plaintiff $21,654.15, over and above all payments, setoffs, and counterclaims, together with $100 solicitor's fees, and the taxable costs and disbursements of this action. The usual judgment of foreclosure and sale was ordered to be entered thereon.

From the judgment entered thereon accordingly, and the whole thereof, the defendants bring this appeal.

This court was required to construe the agreements of August 8, 1888, and April 10, 1889, in *Spaulding v. Stubbings*, 86 Wis. 255. It was there held that *Wilson H. Stubbings*—the plaintiff in this action — and John O'Connor, deceased, were by virtue of such agreements copartners, not only as to creditors, but also as between themselves. Although such partner, yet, as the business was conducted wholly in the name of John O'Connor, *Stubbings* was what is known in law as a " secret " or " dormant " partner. *Benjamin v. Covert*, 47 Wis. 382, and cases there cited. As John O'Connor was the ostensible proprietor of the business, he was, as has been held by this court, a trustee of an express trust, within the meaning of the statute, to the extent that he might have sued upon a partnership demand of the firm without joining his dormant partner. R. S. 1878, sec. 2607; *Platt v. Iron Exch. Bank*, 83 Wis. 358.

Such were the relations of the two partners at the time of the death of John O'Connor. That death of itself dis-

solved the firm for all purposes. The reason is that a surviving partner is not to be bound by the acts of agents not of his own choosing, as the representatives of the deceased partner would be. This being the reason, it is equally applicable where the duration of the partnership is, by an agreement, for a fixed period, as it would be where the duration is indefinite. 2 Bates, Partnership, § 580, and cases there cited. Upon such death of John O'Connor, the plaintiff, as such surviving partner, was undoubtedly entitled to the possession of the assets of the firm for the purpose of paying the debts and settling the partnership business. *Shields v. Fuller*, 4 Wis. 102; *Roys v. Vilas*, 18 Wis. 169. But as such surviving partner he would have had no right to mix the assets of the firm with his own and continue the business the same as though there had been no such dissolution. *Jennings' Adm'rs v. Chandler*, 10 Wis. 21.

But here John O'Connor, as such ostensible proprietor, was in the actual possession of all the partnership assets up to the time of his death; and the plaintiff, as such surviving partner, did not take, nor assume to take, actual possession of any part of such assets. On the contrary, the plaintiff manifestly relied upon the notes of April 10, 1889, secured by mortgage upon real estate, for the repayment of the moneys so advanced by him, and interest, as agreed. In fact, the agreement between the plaintiff and John O'Connor, of the same date, treats the goods and merchandise, the *corpus* of the partnership assets, as the property of John O'Connor, and secures to the plaintiff only "the net profits arising from the  . . .  business," with certain restrictions on John O'Connor as to the manner of conducting the business and keeping the books, and providing that the stock should "not be sold out in bulk without the consent of both parties thereto." *Bartlett v. Jones*, 2 Strob. 471; *S. C.* 49 Am. Dec. 606; *Blanchard v. Coolidge*, 22 Pick. 155; *Howe v. Howe*, 99 Mass. 73.

In harmony with the spirit of that agreement, the widow and children of John O'Connor, immediately upon his death, opened the store, and continued the business in the name of the estate, under the supervision of *George E. O'Connor*, the same as before such death — bought new goods and mixed them with the old goods, and sold indiscriminatingly,— not only for years after the widow and *George* were appointed administrators of the estate, but during the few weeks intervening between such death and such appointment; and from July 31, 1889, such business was so conducted with the knowledge and consent of the plaintiff. Under the repeated rulings of this court, it is very manifest that upon the death of John O'Connor, intestate, his right, title, and interest in the property and business in question did not descend to his heirs, but became vested in his administrators, immediately upon their appointment; and such vesting related back to the time of such death. *Melms v. Pfister*, 59 Wis. 192, and cases there cited; *Miller v. Tracy*, 86 Wis. 333; *Meyer v. Garthwaite*, 92 Wis. 575; *Hall v. Hall*, 98 Wis. 199. The result is that the widow and heirs at law, as such, had no legal right to the property. Their continuance of the business and the purchase and sale of goods, as mentioned, can only be justified under the authority of *George* and his mother as administrators. There is no pretense that they ever entered into any contract of partnership with the plaintiff. There is no ground for holding that upon the death of John O'Connor the plaintiff continued or assumed to continue the business for a day or at all,— much less that the defendants, or any of them, ever acted as the agent or agents of the plaintiff in conducting such business. We must hold that after the death of John O'Connor the business was conducted by the administrators alone for the benefit of the estate. The views thus expressed dispose of a number of questions urged by the defendants.

The court allowed two claims of the defendants, reducing

Stubbings vs. O'Connor and others.

the amount of the note and mortgage at the time they were given to $13,309.22. Of course, that reduced the amount of each of the five coupon notes correspondingly. The court allowed the counterclaim for goods sold and delivered to the plaintiff prior to the death of John O'Connor, with interest, which amounted at the time of making the findings to $962.77. The court also allowed the payment of $1,000 made July 17, 1890, to be applied on the first coupon note as of that date, and also allowed $116.29 as accrued interest on that note, and also allowed $387.50 as accrued interest on the coupon note falling due April 10, 1891. Those two coupon notes fell due prior to July 15, 1891, when the plaintiff exercised his option and declared the whole amount secured by the notes and mortgages as due and payable. By virtue of declaring such option the whole amount became due and payable; and we perceive no rule of law authorizing interest upon interest which subsequently matured, and which, according to the findings, amounted at that time, in the aggregate, to $683.40. The statute declares that, in the computation of interest upon any note, "interest shall not be compounded, nor shall the interest thereon be construed to bear interest, unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith." R. S. 1878, sec. 1689. This court has gone so far as to hold that interest coupons attached to a note or bond bear interest, upon default in payment when due. *Mills v. Jefferson*, 20 Wis. 50; *Cleveland v. Burnham*, 64 Wis. 361; *Nash v. Meggett*, 89 Wis. 493, 494. We certainly cannot extend the rule thus announced. The contract is very exacting and oppressive. While parties must be allowed to make their own contracts so long as they are made understandingly and not in violation of law, yet there is no reason in the case at bar for allowing interest not specifically provided for in the contract.

*By the Court.*— That portion of the judgment of the circuit court allowing such excess of $683.40 is reversed, and the

judgment in all other respects is affirmed. No costs are allowed to either party, except that the appellants must pay the fees of the clerk of this court.